**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

UNITED STATES
OF AMERICA,

        Respondent,                CASE NO. 07-CR-20099

vs.

                                        DISTRICT JUDGE PAUL D. BORMAN

IMAD SALEH AL-SHOUHATI,       MAGISTRATE JUDGE MONA K. MAJZOUB

        Petitioner.
_____/

**REPORT AND RECOMMENDATION**

Petitioner, Imad Al-Shouhati, is currently a prisoner at USP Leavenworth in Leavenworth, Kansas. Before the Court is Petitioner's Motion to Vacate under 28 U.S.C. § 2255. (Docket no. 217.) Also pending before the Court are Petitioner's Motion for Leave to Conduct Discovery (docket no. 216) and Motion for Judgment on the Pleadings (docket no. 222). Respondent filed a Response to Petitioner's 2255 Motion (docket no. 223) and Petitioner's Motion for Judgment on the Pleadings (docket no. 229). Petitioner filed a Reply. (Docket no. 225.) The Motions have been referred to the undersigned for determination. (Docket nos. 219 and 226.) Because the record in this case conclusively shows that Petitioner is not entitled to relief under 28 U.S.C. § 2255, an evidentiary hearing is not required to resolve the merits of this action. 28 U.S.C. § 2255(b). Therefore, the undersigned issues this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(b).

**I.     RECOMMENDATION**: For the reasons stated herein, the undersigned recommends that Petitioner's Motion to Vacate under 28 U.S.C. § 2255 (docket no. 217) be **DENIED**. The Court

should also deny Petitioner's Motion for Leave to Conduct Discovery (docket no. 216) and Motion for Judgment on the Pleadings (docket no. 222) as moot.

**II.     REPORT:**

    **A.     Facts and Procedural History**

Petitioner's background, in relevant part, begins in September 1997.  According to Petitioner's Pre-sentence report, he was arrested on September 9, 1997, in Dearborn Heights, Michigan and was charged with False Pretenses Greater than $100.00 in Wayne County case number 97-007185.  (Pre-sentence Report ¶¶ 46-47; *see also* docket no. 223 at 6.)  Petitioner was then arrested in Bloomfield Hills, Michigan on September 18, 1997, and charged with one count of Felony False Pretense and one count of Forgery/Alt License with Intent in Oakland County case number 97-155259. (Pre-sentence Report ¶¶ 48-49.)  Finally, on September 26, 1997, Petitioner was arrested by the Detroit Police Department and was charged with Uttering and Publishing in Wayne County case number 98-003004.  (*Id.* ¶¶ 50-51; *see also* docket no. 223 at 6.)  On January 15, 1999, Petitioner was sentenced in Wayne County Circuit Court to five years of probation in cases 97-007185 and 98-003004.  (Pre-sentence Report ¶¶ 46, 50.)  He was sentenced to 365 days in jail in the 48th District Court on case number 97-155259.[1]  (*Id.* ¶ 48.)

---

[1] Petitioner and Respondent disagree with regard to the dates on which Petitioner actually committed the crimes in case nos. 97-007185 and 98-003004.  Respondent reads the "Date of Arrest" and assumes that the crime in case no. 97-007185, for which Petitioner was arrested on September 9, 1997, "took place on that date."  Likewise, Respondent assumes that the crime in case no. 98-003004, for which Petitioner was arrested on September 26, 1997, took place on September 26, 1997.  Thus, Respondent argues that Petitioner committed one act on September 9, 1997, was arrested that same day, committed a separate act on September 26, 1997, and was arrested again.  (*See* docket no. 223 at 6.)  Petitioner, however, asserts that he committed both crimes *before* his arrest by Dearborn Heights police on September 9, 1997.  He acknowledges that he was not arrested by Detroit police until September 26, 1997, but he argues that he did not commit the second offense after his first arrest.  (Docket no. 217 at 7-8, 10-11.)  As Petitioner's

Sometime before 2007, Petitioner began selling drugs. On July 7, 2007, Petitioner "was named in a nine-defendant indictment charging a conspiracy to distribute heroin, marijuana and cocaine, along with other offenses." (Docket no. 223 at 1 (citing docket no. 3).) During the relevant portion of the pretrial phase of Petitioner's case (beginning on April 18, 2008), Petitioner was represented by Attorney Richard Ginsberg. (*See* docket no. 128.) On September 19, 2008, Petitioner, through his attorney, negotiated a plea agreement with Respondent. (Docket no. 144.)

In his plea agreement, Petitioner acknowledged that the maximum penalty for his crimes, should he be found guilty, was 40 years in prison with 4 years of supervised release and a monetary fine of $2,000,000.00. (*Id.* at 1.) To avoid this possible sentence, Plaintiff pled guilty to County VIII of the indictment, which charged unlawful distribution of heroin (over 100 grams). (*Id.*) The parties disagreed, however, on the appropriate sentencing guidelines. First, Respondent argued that Petitioner's relevant conduct included his responsibility for up to 1,000 kilograms of marijuana, which would raise Petitioner's base offense level from 28 to 32 (with a 3-point downward adjustment to 29 for accepting responsibility). (*Id.* at 3, 13.) Petitioner asserted that his total offense level should be 25. (*Id.* at 21.) Second, Respondent argued that Petitioner had a Level IV criminal history (with a total of 9 criminal history points) while Petitioner argued that he only had a Level III criminal history (with a total of 6 criminal history points). (*Id* at 20.) The variance in these calculations left Petitioner arguing for a sentence between 70 and 87 months while Respondent was seeking a sentence between 121 and 151 months. (*Id.*) Petitioner waived his right to appeal any issue related to sentencing except with regard to the two issues set forth above. (*Id.* at 6.)

---

Pre-sentence report notes, no police reports are available for these crimes. (Pre-sentence Report ¶¶ 47, 49, 51.)

On January 27 and 28, 2009, the Court held a two-day evidentiary hearing to determine Petitioner's sentence. At the hearing, Petitioner's cousin, Mussa Shohatee, testified that he and Petitioner were engaged in trafficking marijuana. (Docket no. 202 at 9.) Shohatee added that Petitioner had been purchasing marijuana from him for "several years," but while Shohatee had received marijuana by the truckload, including shipments of up to a thousand pounds, Petitioner "didn't buy more than 100 pounds off me" in five- and ten-pound increments. (*Id.* at 10-11.) On cross examination, Shohatee stated that he never sold Petitioner more than 10 pounds of marijuana at a time (with one exception where he sold him 17 pounds) because Petitioner would return what he couldn't resell. (*Id.* at 25-26.) When asked, Shohatee acknowledged that his profit ranged from $50.00 to $150.00 per pound when he sold marijuana in Detroit.

Shohatee also testified that he was the subject of a wiretap investigation and that he had identified Petitioner's voice on the recordings to federal agents. (*Id.* at 17.) He acknowledged that during several conversations, Petitioner had discussed obtaining marijuana from Shohatee. (*Id.* at 17-18.) Shohatee then testified regarding Petitioner's gambling habits. He told the Court that he didn't know whether Petitioner was a "big gambler," but he admitted that he told agents the day before that Petitioner was a big gambler. (*Id.* at 22.) He then testified that Petitioner would lose $5,000 to $10,000 at a time at the casino. (*Id.*)

Special Agent Jeffrey Jacobs of the FBI also testified at Petitioner's sentencing hearing. Special Agent Jacobs testified that in previous discussions with Shohatee (the prior witness), Shohatee had indicated that he sold "multiple hundred-pound quantifies [of Marijuana to Petitioner] on different occasions over a period of years." (*Id.* at 32.) He also indicated that Shohatee had confirmed these statements as recently as the day before the hearing. (*Id.*) Special Agent Jacobs

4

further testified that Shohatee had expressed concerns over giving testimony while his family was in the courtroom. (*Id.* at 33.)

Special Agent Jacobs then testified that according to Shohatee (and confirmed by financial transactions through Petitioner's business), a Canadian drug trafficker by the name of Issam Musaibli had supplied a form of marijuana known as BC Bud to Petitioner. (*Id.* at 33-35.) Special Agent Jacobs indicated that Musaibli had been involved in the kidnaping and torture of an individual named Asure Saleh over 21 pounds of BC Bud.[2] (*Id.* at 34.) He noted that "there is an intercept from our [wiretap] where that was actually discussed by [Petitioner]. He was actually present with Mr. Musaibli during the torture of Asure Soleis [(phonetic)]."[2] (*Id.*)

Special Agent Jacobs then testified that the FBI investigation into Petitioner had uncovered two business accounts wherein Petitioner had approximately $630,000 in unaccounted-for cash deposits. (*Id.* at 39.) He then testified to a detailed account of the investigation into Petitioner's finances. (*Id.* at 39-63.) When asked about the source of Petitioner's deposits, Special Agent Jacobs testified that there was no income that he could associate with Petitioner's alleged legitimate businesses. (*See* docket no. 207 at 12-13.)

On cross examination, Petitioner's counsel asked Special Agent Jacobs several questions with regard to the amount of marijuana that Shohatee had sold to Petitioner. Special Agent Jacobs

---

[2]Special Agent Jacobs initially stated that the amount was "several hundred pounds," and then corrected himself to say that it was "2,100 pounds." (Docket no. 202 at 34.) It appears, however, that the correct amount was 21 pounds, as indicated by Special Agent Jacobs's continued testimony and the arguments of the parties in relation to the instant Motion. (*Id.* at 35; *see also* docket nos. 217 and 223.)

[2]The Court reporter entered the name "Asure Soleis" and noted that the spelling was phonetic. An FBI form provided by Petitioner confirms that the individual was known as "Saleh." (*See* docket no. 217 at 40.)

testified that Shohatee told them that he had sold petitioner "multi-hundred pound" quantities of marijuana, but he never gave agents a particular date for any of these transactions. (*See id.* at 24-30.) Respondent then called Special Agent Jeffrey Moore of the DEA, who testified (in relevant part) that in 2005, the DEA seized $37,000.00 in cash and 8 pounds of marijuana from an address tied to Petitioner. (*Id.* at 43-44.) Special Agent Moore indicated that if Petitioner had sold marijuana and accumulated cash, the $37,000.00 would translate to roughly "60 or 70 pounds." (*Id.* at 44.) He then testified that the DEA tracks drug prices in Detroit, and the average profit margin for marijuana at the relevant time period was anywhere from $100.00 per pound to $300.00 per pound. (*Id.* at 45.) Special Agent Moore stated that he prepared three models for determining the amount of drugs an individual would have sold based on the amount of profit obtained: one model at $100.00 per pound; one at $200.00 per pound; and one at $400.00 per pound. (*Id.* at 46-48.) He estimated that Petitioner likely sold his marijuana for a $200.00 per pound profit "based on their methods of operation." (*Id.* at 48.) On cross examination, Special Agent Moore acknowledged that other than Petitioner being "associated" with the address itself, the DEA had not been able to tie Petitioner to the 8 pounds of marijuana or the $37,000 in cash found at the address in 2005. (*Id.* at 55.)

Petitioner's sentencing hearing was held on February 4, 2009. (*See* docket no. 201.) Respondent argued that the issue regarding the amount of marijuana that could be tied to Petitioner turned on the credibility of Shohatee, who testified in court that he had only sold Petitioner 100 pounds of marijuana but had previously told agents that he sold him "multiple hundreds" of pounds. (*Id.* at 4.) Respondent also noted that Petitioner's unexplained wealth (made up of almost entirely cash deposits) supported a finding that Shohatee's prior statements were more credible. (*Id.* at 4-5.)

Respondent argued that even if the Court assumes Petitioner made $500.00 per pound in profit, it would only take $440,000 in unexplained wealth to assume that Petitioner sold 880 pounds of marijuana.[3] (*Id.* at 7.) Petitioner argued that using profit as a basis for conversion into drug volume was inappropriate and that Respondent had not established that Petitioner was responsible for distributing more than 100 pounds of marijuana. (*Id.* at 9-10.)

The Court found that Shohatee's testimony was not credible and that Special Agent Jacobs's testimony was credible. Specifically, the Court noted the $630,000.00 in Petitioner's bank account as supporting the Agent's testimony. (*Id.* at 12-13.) Nevertheless, erring "on the side of caution," and "not taking the money and converting it into marijuana poundage," the Court found that Shohatee's prior statement indicating that he sold "multiple hundred" pounds of marijuana to Petitioner only supported a finding that he sold Petitioner at least 200 pounds of marijuana. (*Id.* at 11, 13.) Thus, the Court decided "not . . . to take it beyond the two hundred-pound amounts." (*Id.* at 11.) The Court then found that Petitioner was also part of "[t]he incident involving 21 pounds of marijuana . . . where there was a debt and there was some violence against a person who did not pay the debt." (*Id.* at 12.) The Court, therefore, found that Petitioner was responsible for 221 pounds of marijuana, which placed him "at level 30 with a criminal history category of four." (*Id*. at 12, 13.)

Petitioner's counsel then challenged Petitioner's criminal-history categorization. Petitioner's

---

[3]Respondent's profit-model submission prior to sentencing indicates that at the assumed $200.00-per-pound profit level, $100,000.00 in unexplained wealth would translate to 500 pounds of marijuana. (Docket no. 190-7 at 1.) According to Respondent, Petitioner had over $950,000.00 of unexplained cash deposits into bank accounts and had lost over $1,700,000.00 at local casinos. (*See* docket no. 202 at 39; docket no. 201 at 8-9.) At $200.00 per pound, this would equate to over 13,000 pounds of marijuana.

7

criminal history categorization was based on a total of nine criminal-history points, allocated as follows: 3 points for a September 23, 1996 Armed Robbery; 1 point for False Pretenses related to Petitioner's September 9, 1997 arrest; 2 points for Petitioner's September 18, 1997 False Pretenses arrest; 1 point for Uttering and Publishing related to Petitioner's September 26, 1997 arrest; and 2 points for an April 4, 1998 charge for Possession of Illegal Fireworks. (Pre-sentence Report ¶¶ 42, 46, 48, 50, 52, and 56.) Petitioner's counsel argued that the Illegal Fireworks conviction should not be included. (Docket no. 201 at 14-15.) Petitioner's counsel then asserted that the conviction related to Petitioner's September 18, 1997 arrest should not be counted, which would reduce Petitioner's criminal-history points to five and place him under Category III. (*Id.* at 15-17.) The Court agreed with regard to the Illegal Fireworks charge but found that the September 18, 1997 charge was appropriately counted. Therefore, the Court found that Petitioner had a criminal-history score of eight,[4] which placed him in Category IV. (*Id.* at 19-20, 27.) The Court then sentenced Petitioner to 108 months in prison and 4 years of supervised release. (*Id.* at 28; *see also* docket no. 187 at 1-2.)

Petitioner filed an appeal with the U.S. Court of Appeals for the Sixth Circuit challenging only the Court's finding that Shohatee had delivered more than 100 pounds of marijuana to him. *United States v. Al-Shouhati*, No. 09-1332 (6th Cir. Jan 3, 2011); (Docket no. 223-1). Specifically, Petitioned argued that the District Court erred when it found Shohatee's in-court statement less credible than his out-of-court statement and when it used Petitioner's unexplained wealth as a basis

---

[4]The Court originally calculated Petitioner's criminal-history score at seven by reducing the Illegal Fireworks charge from two to zero. (*See* docket no. 201 at 19-20.) The Court was later informed that the charge should still count for one point, so the Court amended its finding and assessed Petitioner a criminal-history score of eight. (*Id.* at 27.)

8

for accepting Shohatee's out-of-court statements. *Id.* at 3. The Sixth Circuit affirmed the District Court's decision, finding that "the district court in this case did exactly what it was supposed to do: make a conservative finding of drug quantity based upon its own reasoned evaluation of the evidence brought forth in an evidentiary hearing." *Id.*

### B. Petitioner's Claims

Petitioner filed his Motion to Vacate under 28 U.S.C § 2255 raising the following claims:

<u>Ground One:</u> Ineffective Assistance of Counsel for failure to investigate defendant's prior State convictions which were functionally consolidated, and failure to move for consideration under U.S.S.G. § 4A1.2.

<u>Ground Two:</u> Ineffective Assistance of Appellate Counsel for failure to raise Brady violation on appeal, and/or prosecutorial misconduct. And failing to raise issues on appeal dealing with alleged 21 pounds of marijuana.

<u>Ground Three</u>: Ineffective Assistance of Counsel for failure to hold prosecution's case to "adversarial testing."

<u>Ground Four:</u> Government's failure to disclose and turn over exculpatory evidence to defendant and failure to correct perjured testimony constitutes prosecutorial misconduct.

<u>Ground Five</u>: Ineffective Assistance of Counsel for failure to impeach D.E.A. Agent Jeffrey Moore at sentencing hearing.

(Docket no. 217 at 3-4.) Petitioner notes that "[n]one of these Grounds were raised in Direct Appeal because defendant's appellate counsel, Mark Satawa, either refused to raise these issues or advised defendant to file a §2255 Motion." *Id.*

In his Motion for Leave to Conduct Discovery, Petitioner seeks production of the lab reports related to the June 2005 search regarding which Special Agent Moore testified the DEA found 8 pounds of marijuana; Petitioner asserts that the actual weight of the marijuana was only 4 pounds. (Docket no. 216 at 2.) Petitioner also seeks statements from the interviews of Issam Musaibli,

Bashir Saleh, and Mussa Shohatee related to the "alleged torture and 21 pounds of marijuana." (*Id.* at 3.)

In his Motion for Judgment on the Pleadings, Petitioner notes that the Court Ordered Respondent to file a Response to his §2255 Motion on or before March 23, 2012. (Docket no. 222 (citing docket no. 221).) Petitioner asserts that as of the day he filed his Motion, Respondent had failed to file such a Response, and therefore, the Court should grant his §2255 Motion, provide him with an evidentiary hearing, appoint counsel, or deem any later response by Respondent as waived. (*Id.* at 222.) Respondent filed its Response on April 3, 2012, the day after Petitioner filed his Motion for Judgment on the Pleadings. (Docket no. 223.)

**C.     Standard**

A petitioner who files a motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 must demonstrate that there was an error of constitutional magnitude, the sentence was imposed outside the statutory limits, or there was an error of fact or law so fundamental as to render the entire proceeding invalid. *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir.2001) (citation omitted). To prevail on a motion to vacate, set aside, or correct sentence alleging constitutional error, the petitioner must show that the error had a substantial and injurious effect or influence on the proceedings. *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).

**D.     Analysis**

     **1.     Petitioner's Ineffective Assistance of Counsel Claims**

As a preliminary matter, Respondent argues that Petitioner's "claim that his sentencing guidelines were incorrectly calculated, for the specific reasons advanced in this motion", were not raised on appeal, and therefore, Petitioner's claims are procedurally barred. (Docket no. 223 at 3-4.)

10

As Respondent acknowledges, however, Petitioner has "repackage[d]" (as Respondent puts it) his sentencing issues as an ineffective-assistance claim. (*See id.* at 4.) Such a tactic is neither improper nor disfavored. *Accord Brazil v. U.S.*, No. 07-20531, 2013 WL 5476249, *3 (E.D. Mich. Oct. 1, 2013) (Luddington, J.) (holding that the petitioner was entitled to bring claims for ineffective assistance of trial and appellate counsel related to a *Batson* challenge even where the petitioner had procedurally defaulted on the *Batson* challenge itself, because "'the two claims are analytically distinct'" (quoting *White v. Mitchell*, 431 F.3d 517, 526 (6th Cir. 2005))). Thus, as the *Brazil* court found, "both of [Petitioner's] ineffective assistance of counsel claims may be raised at this point of the proceedings." *Id.*

The Sixth Amendment right to counsel and the corollary right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish ineffective assistance of counsel, Petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id.* at 687. These two components are mixed questions of law and fact. *Id.* at 698. Further "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. That is, if "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.* at 689; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[Petitioner] must overcome the

11

presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citations omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. With respect to the prejudice prong of the *Strickland* test, the ultimate inquiry is "whether there is a reasonable probability that, absent [counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. That is, "there is a reasonable probability that, but for counsel's unprofessional errors, the result . . . would have been different." *Id.* at 694.

### a. Petitioner's Ground 1: Trial Counsel's Failure to Argue for Consolidation of Past Crimes

While not clearly set forth in his Motion, Petitioner appears to assert that his trial attorney, Richard Ginsberg, was ineffective under *Strickland* when he failed to argue that Petitioner's two Wayne County fraud cases (97-007185 and 98-003004) should have been consolidated under U.S.S.G. §4A1.2. (Docket no. 217 at 7-8.) Section 4A1.2 states, in relevant part, as follows:

> (2) If the defendant has multiple prior sentences, determine whether those sentences are counted separately or as a single sentence. Prior sentences always are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest (i.e., the defendant is arrested for the first offense *prior to committing* the second offense). If there is no intervening arrest, prior sentences are counted separately unless . . . (B) the sentences were imposed on the same day.

U.S.S.G. §4A1.2(a)(2) (italics added). Petitioner asserts that he committed the offenses in each of the relevant cases on the same date and that he was sentenced on the same date; therefore, he should have been assessed one criminal-history point instead of two. (Docket no. 217 at 8.) Respondent acknowledges that Petitioner was sentenced on January 15, 1999, in both cases and that he received a concurrent sentence of 5 year probation for each offense. Thus, the applicability of §4A1.2 turns

12

on when Petitioner committed the crimes and when he was arrested.

Respondent argues that "the presentence report states, and an independent review of the petitioner's LEIN printout confirms" that Petitioner was arrested by Dearborn Heights Police on September 9, 1997, "for an offense that took place on the same date." (Docket no. 223 at 6.) According to Respondent, Petitioner was arrested two more times that month, including on September 26, 1997, by the Detroit Police Department "for an offense committed on the same date.' (*Id.*) While the undersigned agrees with Respondent that the dates of Petitioner's arrests cannot be questioned, nothing in the presentence report clearly indicates that Petitioner *committed* the offenses on the same date that he was arrested for them. And because Petitioner's sentences were imposed on the same day for the two crimes in question, to be counted separately, the actual commission of the offense must be separated by an intervening arrest. Thus, if Petitioner, as he contends, committed both offenses on or before September 9, 1997, the Court erred when it counted the offenses separately. As Petitioner notes, regardless of whether his argument would have ultimately succeeded, his trial counsel could have raised this issue. (*See* docket no. 217 at 11.)

Because there are no police reports available to corroborate Petitioner's assertion that he committed the offenses on the same date, the Court cannot determine whether case numbers 97-007185 and 98-003004 should have been consolidated for purposes of calculating his criminal-history score. Nevertheless, even if the Court were to accept Petitioner's version of events, Petitioner cannot show that but for counsel's failure to raise this issue, the result would have been different. As noted, the Court ultimately found that Petitioner's criminal-history score was an eight. (Docket no. 201 at 19-20, 27.) Thus, had the Court not separated the two offenses, he would have been assessed one point instead of two points, for a total criminal-history score of seven. A score

13

of seven and a score of eight are each listed in Criminal History Category IV. U.S.S.G. §5A. Therefore, because Petitioner cannot show prejudice under the second prong of *Strickland*, the Court should deny his Motion on Ground 1.

### b. Petitioner's Ground 2: Appellate Counsel's Failure to Raise a Brady Violation on Appeal

Petitioner asserts that his appellate counsel was ineffective under *Strickland* when he failed to raise an argument on appeal that Respondent violated Petitioner's rights under *Brady v. Maryland*, 373 U.S. 83 (1963), where the government failed to produce evidence that Petitioner alleges is contradictory to the Special Agent Jacobs's testimony at Petitioner's sentencing hearing. (Docket no. 217 at 12-18.) Specifically, Petitioner contends that Respondent withheld a "302 Statement" given by Saleh (docket no. 217 at 39-40), and he implies that Respondent withheld transcripts of a wiretap (docket no. 217 at 41-45), both of which Petitioner asserts would have shown that Special Agent Jacobs committed perjury (or at the very least was mistaken) when he testified that Petitioner was "actually present with Mr. Musaibli during the torture of [Saleh]"(docket no. 202 at 34). (Docket no. 217 at 12-18.) Petitioner argues that this information would have cast doubt on Special Agent Jacobs's testimony, on which the Court relied in finding Petitioner responsible for the 21-pounds of marijuana at issue during Saleh's torture. (*Id.*) Thus, Petitioner asserts, the Court would have set his offense level at 25, instead of 27.[5] (*See id.*) Defendant asserts that the new reports referred to by Petitioner do not support his claims. (Docket no. 223 at 7.)

---

[5]The Court gave Petitioner a base offense level of 30, finding him responsible for the equivalent of 700 kilograms of marijuana (combining 600 grams of heroin and 221 pounds of marijuana), for a base offense level of 30. (*See* docket no. 201 at 12.) He was given a 3-point reduction for taking responsibility, which reduced his offense level to 27. (*Id.*) If Petitioner had been found responsible for 200 pounds of marijuana instead of 221 pounds, his base offense level would have been 28, for a total level of 25. *See* U.S.S.G. §2D1.1(c)(5) and (c)(6).

"A *Brady* claim contains three elements: (1) the evidence 'must be favorable to the accused' because it is exculpatory or impeaching; (2) the State must have suppressed the evidence, whether willfully or inadvertently, and (3) the evidence must be material, meaning 'prejudice must have ensued' from its suppression." *Webb v. Mitchell*, 586 F.3d 383, 389 (6th Cir.2009) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). Even assuming, *arguendo*, that Respondent withheld the 302 Statement and the wiretap transcripts, the undersigned finds that no prejudice resulted from its suppression; that is, the Court agrees with Respondent that the evidence does not support Petitioner's claims.

With regard to the 302 Statement, Petitioner asserts that this statement, by Saleh (the victim of the alleged beating), "proves [Petitioner] was not present at the alleged torture/beating." (Docket no. 217 at 14.) Petitioner is correct that (the unredacted portion of) Saleh's 302 Statement only implicates three individuals in his beating: Musaibli, Maisari, and "Ramsey." (*Id.* at 39-40.) But even if the Court were to accept that Petitioner was not "responsible for beating up Saleh," it does not rebut Special Agent Jacobs's testimony that Petitioner was "present."[6]

Moreover, with regard to the wiretaps, Petitioner argues that the first wiretap proves that Petitioner "did not know or was not present at the torture and did not become aware of it until he heard about it and spoke with [Saleh] about it." (Docket no. 217 at 18.) Petitioner argues that the second wiretap "clearly inferres (sic) [Petitioner] did not have first hand information about the beating of [Saleh]" because he said "who screwed them up." (*Id.*) To the contrary, the first wiretap

---

[6]The undersigned also notes that the document provided by Petitioner is heavily redacted. (*See* docket no. 217 at 39-40.) It is impossible to know from reviewing this document whether the information contained therin was actually provide by Saleh or whether some other portion of the document refers to Petitioner.

15

transcript appears to support Special Agent Jacobs's testimony. While petitioner (who is referred to on the transcript as "Showtime") tells Shohatee that Saleh (referred to as "B") is going to call and that he "had nothing to do with it," he notes, "That f***ker was crying and called my name asking me to feel sorry for him; 'Help me and sympathize with me, Showtime.'" (*Id.* at 41-42.) He then states, "I had nothing to do with it. I did not get near him, hold him or beat him." (*Id.* at 42.) Petitioner then told Shohatee that "Ramzy" was beating Saleh." (*Id.*) Thus, Petitioner's statements support a finding that he was present, even if he was not involved directly in the beating; that is, he did not get near him, hold him, or beat him.

With regard to the second wiretap, again, the undersigned does not find Petitioner's argument compelling. Petitioner did use the phrase "who screwed them up, did they tell you?" But Petitioner's next phrase was, "Bashir [Saleh], yea screwed them up. Meh ... uh... what a retard bro... . . . They smacked him around and he returned the merchandise." Thus, it appears that the "they" to whom Petitioner referred was actually the drug suppliers, not Saleh. Petitioner confirmed that Saleh "screwed up" the suppliers by taking their merchandise. He then confirmed his knowledge of Saleh's beating, which caused him to return the merchandise. The rest of his conversation with Shohatee appears to be a conversation between two individuals who both have knowledge of the severity of the beating. (*See id.*)

Petitioner has not shown that the information allegedly withheld from him during his sentencing phase resulted in any prejudice. Thus, he cannot support his claim for a violation of his rights under *Brady*. Therefore, Plaintiff has likewise failed to show that his appellate counsel was ineffective for failing to raise such a claim. Petitioner's Motion should be denied on Ground 2.

        **c.**        **Petitioner's Ground 3: Trial Counsel's "failure to hold the prosecution's case to adversarial testing."**

Petitioner's Ground 3 asserts that his trial counsel "failed to hold the prosecution's case to adversarial testing" when his trial counsel failed to object to or otherwise challenge Special Agent Jacobs's testimony with regard to Petitioner's involvement in the beating of Saleh. (Docket no. 217 at 18-29.) Thus, for the reasons set forth above, Petitioner cannot support his claim, and his Motion should be denied with regard to Ground 3.

### d. Petitioner's Ground 5: Trial Counsel's "failure to impeach D.E.A. Agent Jeffrey Moore."

Petitioner asserts that his trial counsel was ineffective under *Strickland* when he failed to challenge Special Agent Moore's assertion that the D.E.A. found eight pounds of marijuana at an address tied to Petitioner when, in fact (according to Petitioner), the actual weight was four pounds.[7] (Docket no. 217 at 35-38.) Petitioner's claim, however, fails because the Court did not hold Petitioner responsible for the marijuana found at this address. Therefore, Petitioner cannot show that any prejudice resulted from his counsel's alleged failure to challenge Special Agent Moore's testimony.

### 2. Petitioner's Ground 4: Prosecutorial Misconduct

Petitioner's Ground 4 asserts that the government's attorney committed prosecutorial misconduct when he allowed Special Agent Jacobs to testify with regard to Petitioner's involvement in the alleged beating of Saleh. (Docket no. 217 at 30-35.) Petitioner also alleges that it was prosecutorial misconduct to allow Special Agent Moore to testify regarding the 8 pounds of marijuana discussed herein. (*Id.*)

To establish a claim of prosecutorial misconduct, a petitioner "must show (1) that the

---

[7]The lab reports verifying the amount of marijuana found at this location are the subject of Plaintiff's instant Motion for Leave to Conduct Discovery. (Docket no. 216.)

prosecution presented false testimony (2) that the prosecution knew was false, and (3) that was material." *Abdus-Samad v. Bell*, 420 F.3d 614, 625-26 (6th Cir.2005). "Moreover, the [petitioner] must show that the statement in question was 'indisputably false,' rather than merely misleading." *Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir.2000) (*quoting United States v. Lochmondy*, 890 F.2d 817, 823 (6th Cir.1989)). With regard to Petitioner's assertions regarding Special Agent Jacobs's testimony, his claim fails for the same reason that his ineffective-assistance claims fail: Petitioner cannot show prejudice. Moreover, Petitioner cannot show that the statement was "indisputably false." Likewise, Petitioner's claims with regard to Special Agent Moore's testimony fail because Petitioner cannot show prejudice; the Court did not consider any of the marijuana to which Special Agent Moore testified when calculating Petitioner's sentencing guidelines. Therefore, the Court should deny Petitioner's Motion with regard to his Ground 4.

**D.     Conclusion**

For the reasons stated above, Petitioner's Motion to Vacate under § 2255 [217] should be denied. The Court may, at its discretion, determine whether an application for a certificate of appealability should issue. *See* 28 U.S.C. § 2253(c). Petitioner's Motion for Leave to Conduct Discovery [216] and Motion for Judgment on the Pleadings [222] should also be denied.

**III.     NOTICE TO PARTIES REGARDING OBJECTIONS:**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th

18

Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n Of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc. Any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than fourteen days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

Dated: April 2, 2014                              s/ Mona K. Majzoub
                                                  MONA K. MAJZOUB
                                                  UNITED STATES MAGISTRATE JUDGE


**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Imad Al-Shouhati and Counsel of Record on this date.


Dated: April 2, 2014                              s/ Lisa C. Bartlett
                                                  Case Manager